

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-13-00060-CR

_____

TARSHA LASHA SIMMONS AKA TARSHA LASHA THOMPSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 5th District Court
Cass County, Texas
Trial Court No. 2011F00194

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

At Tarsha Lasha Simmons' jury trial for felony driving while intoxicated (DWI),[1] there was strong intoxication evidence, including testimony about Simmons' behavior, appearance, smell of alcohol, and abysmal performance on field sobriety tests. On the scene and shortly thereafter, Simmons claimed to have consumed only "a couple of beers" or "two to three beers." Through an expert witness, the State attacked those claims with Simmons' blood-alcohol reading, taken one hour and forty minutes after the stop, of between .242 and .259, and the expert's opinion testimony that such readings were not possible under normal circumstances for someone who had consumed only two to three ordinary beers.

On appeal, Simmons argues that the trial court erred in admitting retrograde extrapolation evidence regarding her blood-alcohol level at the time of the offense and that there is legally insufficient evidence to support assessing court costs against her for lack of a certified bill of costs in the record. We affirm the trial court's judgment because (1) the State did not offer retrograde extrapolation evidence, and (2) the State supplemented the record with a certified bill of costs.

A short time after 1:30 p.m., September 12, 2011, Lu Wilson stopped at the home of his friend, Theodis Jackson, the uncle of Simmons. He saw Simmons there eating a salad and drinking beer. He did not know how many beers she consumed, but he noticed that her speech was slurred and she was staggering. Wilson described Simmons' demeanor as "high" and "[i]ntoxicated." Though he did not remember exactly what time he arrived or what time he

---

[1]Simmons was convicted, sentenced to ten years' confinement, assessed a $7,500.00 fine, and ordered to pay court costs of $594.00.

departed, he remembered being there about forty-five minutes. After Wilson left, he went to Miracle Mart in Linden, where he saw Simmons drive into the parking lot of the Linden Elementary School, pick up one of her children, and begin to drive away. Believing her too intoxicated to drive, Wilson called 9-1-1, described Simmons' car, and told the dispatcher that Simmons was drunk. Shortly thereafter, he saw Officer Elvin Hickman pull his patrol car behind Simmons' car.

Della Stevens, the dispatcher for the Cass County Sheriff's Department, testified that she received a call reporting that, in the parking lot of the E-Z Mart, there were children and an intoxicated adult female in a green Cougar automobile. Stevens dispatched officers to that location.

Hickman, of the Linden Police Department, and Eric White, a trooper with the Texas Department of Public Safety, were separately dispatched to the E-Z Mart to seek "a green Mercury vehicle sitting at the gas pump with an intoxicated driver." Around 5:15 p.m., when Hickman "pulled into the parking lot [, he] observed a green Mercury Cougar sitting at the gas pump" with the engine running. On approaching the vehicle, Hickman smelled a "strong odor of alcohol" on Simmons and observed that she had bloodshot eyes, her speech was slurred, and she was unable to produce her insurance card or driver's license. She told him that she was going to pick her children up from school and that then she was on her way home. He testified Simmons was "unsteady on her feet, [and] had to lean up against the car to keep her balance." A video recording of the stop was admitted and played for the jury. Based on his education, training, and

3

experience and the "totality of the [field sobriety] tests performed by Trooper White," Hickman opined that Simmons was intoxicated.[2]

On cross-examination, Hickman admitted that the smell of alcohol does not necessarily indicate that a person is intoxicated, when alcohol was last consumed, or whether the alcohol was mixed with food. Similarly, he testified that other things besides intoxication could cause someone to have bloodshot eyes.

White, who arrived at the scene shortly after Hickman, testified that Simmons' speech was labored and, at times, "quite slurred." He described her eyes as "somewhat red and watery," and he saw that she was "a little bit slower reacting than what would be considered normal, probably." During the stop, White said Simmons "always returned to the car for support" and that she was unable to stand very well when away from the car. Simmons told him that she had consumed a "couple of beers," though later during the jail interview, Simmons stated she had two or three beers, which White stated is the "most common" response DWI defendants give when asked how much they have had to drink.

White performed the horizontal gaze nystagmus (HGN) and walk-and-turn field sobriety tests on Simmons. White testified that Simmons exhibited "six out of six" intoxication clues on the HGN test and "all eight" intoxication clues on the "walk-and-turn" test. Simmons explained her poor performance to White by saying she had knee problems, had been sick recently, and was on medication. About one hour and forty minutes after the stop, Simmons voluntarily took a

---

[2]Hickman never saw Simmons drive the car.

breathalyzer test on the Intoxilyzer 5000, which showed her to have an alcohol level between .242 and .259. Simmons was arrested and charged with DWI.

At trial, Rex Swords testified for the State and was qualified, over Simmons' objection, as an expert on the Intoxilyzer 5000 and as a person "able to testify about the effects of alcohol on a person's mental and physical faculties." He testified that a person was intoxicated at a .08 reading and that a person with an alcohol concentration of .242 would have lost the normal use of their mental faculties and would be intoxicated. Swords admitted that the breath test does not consider a person's weight, the types of drink the subject consumed, or how much a person has had to eat.

Swords testified that, from the breath samples taken well after the stop, there was no way to know what Simmons' alcohol concentration was at the time she was alleged to have been driving. However, Swords opined that, generally speaking, if Simmons had nothing to eat or drink for an hour before the stop, she would have reached the highest alcohol concentration she was going to achieve "because she had an hour to absorb the alcohol and hadn't taken any in in an hour, so you'd think that would be enough time to reach her peak and possibly start to decrease in alcohol concentration, generally speaking."

Over Simmons' objection, Swords was allowed to testify that, "unless there were some very unusual circumstances," if Simmons had consumed two or three beers as claimed, the highest alcohol concentration she could have reached would be .07 and .10, respectively. In forming that opinion, Swords considered Simmons' listed weight of 145 pounds and assumed that (1) the beers she consumed were twelve-ounce beers, (2) the beers had five percent alcohol

5

by volume, and (3) Simmons had a normal "amount of water per pound of body weight." Based on those assumptions and barring "some outlier, some conditions," he did not think it was possible for a woman of Simmons' weight to reach a concentration of .242 from two or three beers. However, on cross-examination, Swords testified that, based on the same assumptions he made earlier, it would take a minimum of seven beers for Simmons to reach an alcohol concentration of .24. He said the concentration could be "quite a range" because he did not know all of Simmons' physical characteristics.

*(1)    The State Did Not Offer Retrograde Extrapolation Evidence*

In her first point of error, Simmons contends that the trial court erred by allowing Swords' testimony because (a) he was not qualified to give retrograde extrapolation testimony—that is, testimony of what Simmons' alcohol concentration was at the time of the stop—and (b) the testimony was unreliable.

Before addressing these questions, we must first ascertain whether the issue before the Court comports with the objection lodged in the trial court. It is a well understood principal of appellate law that the objection lodged before the trial court must comport with the issue that is asserted on appeal. *See Martinez v. State*, 345 S.W.3d 703, 705 (Tex. App.—Amarillo 2011, no pet.) (citing *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009)). If the objection at trial does not comport with the ground asserted on appeal, nothing is preserved for appellate review. *Id.*

Here, Simmons objected to Swords' testimony because it was "[o]utside the area of this expert's qualifications" and "[o]utside of this witness' area of expertise." Because Simmons

6

failed to object to the reliability of Swords' opinion, she failed to preserve that issue for our review. We next address the issue of retrograde extrapolation testimony.

"Retrograde extrapolation is the computation back in time of blood-alcohol level—that is, the estimation of the level at the time of driving based on a test result from some later time." *Mata v. State*, 46 S.W.3d 902, 908–09 (Tex. Crim. App. 2001). Following this procedure, an expert possessing sufficient information concerning such variables as an individual's weight, age, mental state, drinking pattern, type and amount of alcohol consumed, amount of food in the stomach, and the time period of alcohol consumption, can reliably estimate a person's blood-alcohol concentration at the time of driving. *See Kirsch v. State*, 306 S.W.3d 738, 744 n.19 (Tex. Crim. App. 2010).

In this case, Swords testified, based on several assumptions and barring unusual physical conditions, that it was not possible for Simmons to have an alcohol concentration of .242 if she had consumed two or three beers, because the maximum she could have reached under those circumstances was a .10. Swords did not testify as to what Simmons' alcohol concentration was at the time of the stop. By definition, his testimony was not retrograde extrapolation. We overrule this point of error.

*(2)    The State Supplemented the Record With a Certified Bill of Costs*

Simmons also contends that there is legally insufficient evidence to support the award of court costs of $594.00 against her, because there is no certified bill of costs in the record. After Simmons filed her appellate brief, the State supplemented the record with a bill of costs totaling $594.00.

7

If a criminal action is appealed, "an officer of the court shall certify and sign a bill of costs stating the costs that have accrued and send the bill of costs to the court to which the action or proceeding is transferred or appealed." TEX. CODE CRIM. PROC. ANN. art. 103.006 (West 2006). "A cost is not payable by the person charged with the cost until a written bill is produced or is ready to be produced, containing the items of cost, signed by the officer who charged the cost or the officer who is entitled to receive payment for the cost." TEX. CODE CRIM. PROC. ANN. art. 103.001 (West 2006). The Texas Rules of Appellate Procedure permit supplementation of the clerk's record if "a relevant item has been omitted." *See* TEX. R. APP. P. 34.5(c)(1).

A certified bill of costs need not be filed at the time the trial court signs the judgment of conviction or before a criminal case is appealed. *See* TEX. CODE CRIM. PROC. ANN. arts. 103.001, 103.006. When a trial court's assessment of costs is challenged on appeal and no bill of costs is in the record, it is appropriate to supplement the record pursuant to Rule 34.5(c), because a bill of costs is required by Article 103.006. *See* TEX. R. APP. P. 34.5(c); TEX. CODE CRIM. PROC. ANN. art. 103.006.

We recently addressed this issue. *See Allen v. State*, No. 06-12-00166-CR, 2013 WL 1316965 (Tex. App.—Texarkana Apr. 3, 2013, no pet.). We noted that court costs are not part of the sentence and that a bill of costs is not evidence, "but rather a governmental record" that is "merely a documentation of what occurred during the trial." *Id.* at *2; *see Armstrong v. State*, 320 S.W.3d 479, 481 (Tex. App.—Amarillo 2010), *rev'd in part by* 340 S.W.3d 759, 766–67 (Tex. Crim. App. 2011). The record can be supplemented with a bill of costs.

> The substance of the bill of costs is not newly created, only the compilation of the substance is new. The bill of costs is an "omitted" item because it is only a

8

compilation of records that existed previously.  *See* TEX. R. APP. P. 34.5(c) (allowing for supplementation of clerk's record "[i]f a relevant item has been omitted").

*Allen*, 2013 WL 1316965, at *2.  Accordingly, we overrule this point of error.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:     November 25, 2013
Date Decided:       December 20, 2013

Do Not Publish

9