**Opinion issued June 30, 2016**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-15-01050-CR

_____

**DANILO DE JESUS MEZA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the County Criminal Court at Law No 5**
**Harris County, Texas**
**Trial Court Case No. 2013443**

---

## O P I N I O N

This is a DWI case.  The only issue is whether there is sufficient evidence that appellant's blood alcohol content was at least .15 or above at the time of the accident to support a Class A misdemeanor DWI conviction.  Concluding there is insufficient evidence to support the Class A misdemeanor conviction, we reverse

appellant's conviction on that charge and render a judgment of acquittal. We remand for a new trial on the lesser-included Class B misdemeanor DWI offense.

## BACKGROUND

### A. Trial Evidence

Officer G. Arroyo with the University of Houston police department testified that he was called to the scene of a single-car accident on Calhoun Street on March 6, 2015 at about 1:40 am. He found an Infinity G35 Coup laying upside down on its roof and debris scattered about. There was no one in the car, but a group of people had gathered around. He began looking for witnesses to what happened, and several people told him that the driver just climbed out and walked away. Eventually several of the witnesses pointed to appellant hiding behind a portable building. When Arroyo approached him, appellant was stumbling, had "the smell of alcohol coming off of him, [and] bloodshot eyes." Appellant admitted to being the driver, stated that he was driving his uncle's car, and he declined medical attention.

Appellant also told the officer that he had been drinking and had five or six beers. Appellant could not recall when he had those drinks, but Arroyo testified that appellant was slurring his speech. When Arroyo asked appellant to perform field sobriety tests, appellant refused, saying he was too cold.

Arroyo arrested appellant because he believed appellant was intoxicated to the point that he had lost use of mental and physical faculties. At the police station, appellant consented to a Breathalyzer test.

M. Skelton testified that when appellant was brought to Central Intox, the center where standardized field sobriety tests, breath tests, and blood tests are performed, she began by administering field sobriety tests. First appellant took the "one-leg stand" test, which has four markers indicating intoxication: (1) raising arms more than six inches above the side of the body, (2) putting the raised foot down, (3) using arms for balance, and (4) swaying and hopping. Appellant put his foot down and swayed. He also bent his leg and was unable to count out loud, which are not markers for impairment, but can be considered in determining intoxication by loss of mental faculties.

During appellant's walk-and-turn test, he also exhibited signs of impairment. Specifically, after having the test explained to him multiple times, appellant broke position, used his arms to balance, took an improper turn, and took an extra step.

The horizontal gaze nystagmus test was next administered, which indicates impairment if the eyes jerk involuntarily and gaze to the side. Skelton observed several clues of impairment in this test: (1) lack of smooth pursuit (involuntary jerking of the eyes as they gaze to the side), (2) two clues for "distinct and sustained nystagmus, maximum deviation," and (3) two clues for the "onset of

3

nystagmus from prior to 45-degree angle." She testified that appellant's results on these tests indicate a "BAC, the blood alcohol concentration higher than 0.10 which is 77 percent accurate."

Appellant then consented to giving two breath samples, which registered BACs of .176 and .173. T. Israel, a technical supervisor, testified to the accuracy of these results at the time the test was taken. Then the State began asking questions about extrapolation back to the time of the wreck, which drew an objection from defense counsel:

> Q. Do the results – are the results on this test slip above .08?
>
> A. Yes, sir.
>
> Q. Are they above a .15?
>
> A. Yes, sir.
>
> Q. Are you familiar with the technique known as retrograde extrapolation?
>
> A. Yes, sir.
>
> Q. And can you talk about what that is?
>
> A. All it is [is] a BAC guesstimation. Texas is a time of stop state. So, if we have certain facts, we can estimate what a person's breath alcohol was at the time of driving based off of what we have on the test record.
>
> Q. And how do you go about doing that?
>
> A. Again, we have to have certain facts. Most importantly, a time of last drink, height, weight, gender, time of last meal, time of last stop, what they ate are all very important as well when factoring into this.
>
> Q. So, knowing those facts, what's the actual process to do a retrograde extrapolation?

A. If everything aligns and we are able to perform a retrograde extrapolation, we use the lowest number of elimination rate ever reported which is a .01. With that, if we have X amount of time from stop, to X amount of time from test, we are able to add back that .01 an hour to get an approximation of what their breath alcohol was.

Q. And so, you mentioned the term "elimination." What is that?

MR. HARRIS: Judge, Judge, I'm going to have to object to this line of questioning. The Court has made the state aware that they are not to attempt any kind of retrograde extrapolation without all the factors that are laid out in *Mata* and *Burns*. The state knows that if you do not have those factors, the witness knows she cannot extrapolate in this case. And they are attempting to get around that which just flies in the face of the *Burns* case and the *Burns* decision. So, I'd ask that the state be precluded from continuing this line of questioning.

THE COURT: I'd like to think this is a good faith by the state, and it's not. Counsel, so right now, I don't know what they know or you know. I'm just sitting with them and listening carefully.

MR. HARRIS: Okay.

THE COURT: So, take it slow and steady. If you don't have the extrapolation factors, let's back this process down. Back to you.

MR. MOORE: Judge, may we approach real quick?

THE COURT: Come up.

(At the Bench)

(Jury not present)

MR. MOORE: So, Judge, at this point, we're just trying to lay a foundation for the process that she's talking about so that we can get some of the details without performing an extrapolation.

MR. HARRIS: It's completely irrelevant, Judge.

THE COURT: Well, if you can't make the factors extrapolation, let's not spin our wheels getting there, to take the jury with a number you can't extrapolate to.

5

MR. MOORE: It's not the extrapolation. We believe we can determine at least a rough estimate of how many drinks it would take to reach a certain amount.

MR. HARRIS: Judge –

THE COURT: On the face of *Mata*, you're all over the place here. Give us a real good faith effort. Stand by your objections.

MR. HARRIS: Judge, my understanding is of what the state is attempting to do here is to get the jury the information to, as you say, taint the jury, give them the information to be able to do their own extrapolation.

THE COURT: Well, I hope they are not going to do that. Approach before they do that.

MR. HARRIS: Okay.

THE COURT: All right.

(Jury present)

Q. (BY MR. MOORE) Without having a time of last drink, are you able to perform an accurate retrograde extrapolation?

A. No, sir.

Q. But can you still talk about the way that alcohol is scientifically eliminated from the body?

A. Yes, sir.

Q. And so, could you just go back a step and tell us about elimination?

MR. HARRIS: Judge, I'm going to object as to relevance and prejudicing the jury.

THE COURT: I'm going to hear it, counsel, briefly. Stand by your objections. So, we're talking about the standard rate of elimination. Counsel, are you trying to backdoor extrapolation here? Is that what you're getting to?

MR. MOORE: No, Your Honor.

THE COURT: Be cautious about it.

MR. HARRIS: Judge, can we approach?

6

THE COURT: You don't need to. Just make your objection. We don't need to go back and forth. If you have an objection, just shout it out. I'm dying to hear it.

Q. (BY MR. MOORE) So, if I gave you some facts about a defendant, would you be able to roughly determine how many drinks it would take that person to reach a .176 or .173?

A. A rough estimation, yes.

Q. And what facts would you need to be able to perform that estimate?

A. A good baseline would be gender, height, weight, and the concentration you're looking at.

Q. So, if you had a 19-year-old male at 5'9 and 143 pounds – and I'm sorry, what was the other information you gave?

A. The concentration you were looking for.

Q. – of .176.

A. When we estimate the amount consumed, we use a .02 for a 150 pound male for a standard drink. So, that would be your 12-ounce beer, your four ounces of wine.

MR. HARRIS: Judge, I'm sorry. I'm going – I'm going to object as to nonresponsive. The state asked if she was able to do that, if she had certain information. It's a yes or no question.

THE COURT: Overruled, counsel. Proceed, state. It's a 12-ounce beer. Did you say four ounces of wine?

THE WITNESS: Yes, sir, four or five.

A. And also an order of 80 proof liquor. So, we use .02 per drink to reach a .176. With that .02, you would – I would estimate somewhere between seven to nine drinks in their system.

THE COURT: So, she estimated seven to nine drinks in the system at the time of testing.

Q. (BY MR. MOORE) And based on that .176, so you mentioned that seven to nine drinks.

A. Yes, sir.

Q. And you said in their system?

A. Yes, sir.

Q. And what does in their system mean?

A. That means I'm not accounting for elimination. That would be seven to nine in their system that hasn't been eliminated at that time.

On cross-examination, Israel explained the three phases of intoxication, and why testing appellant's intoxication level at some point after he stopped consuming alcohol does not necessarily mean that the BAC reflected in that test is necessarily lower than appellant's BAC at the time of the accident. In other words, he testified that BAC can go up or down, depending on where a person is in the three phases of intoxication at the time he or she is tested:

Q. Seven to nine drinks not accounting elimination –

A. Yes, sir.

Q. – is your testimony.

Also, not counting if there's more in the stomach that has not absorbed either, right?

A. Correct.

Q. Okay. So, you don't know where his – because there's, basically, three phases to alcohol intoxication, right?

A. Yes, sir.

Q. There's absorption –

A. Yes, sir.

Q. – where we absorb the alcohol that's going in our system. And there's the second phase is peak where all the alcohol that's been ingested, has been absorbed, correct?

A. Yes, sir.

Q. And then we go into a more gradual elimination rate, correct?

8

A. Yes, sir.

Q. And that's third phase. You can't say where someone is in the state's hypothetical, can you?

A. No, sir, I cannot.

Q. You can't say if there's still alcohol in their stomach that can still be absorbed –

A. Correct.

Q. – and that their BAC could still be climbing?

A. Correct.

Q. And that's precisely why you cannot perform a retrograde extrapolation.

A. Yes, sir.

Although Israel was not able to do a retrograde extrapolation, the trial court let her opine upon whether she believed appellant *could have* had a BAC of less than .08 at the time of the accident:

Q. So, we can't speculate about what his alcohol content would have been at the time of the crash. But based on your training and experience, with a crash at roughly 1:45 and a test at roughly 3:20 with a result of .176, is there any scenario you can think of that results in a breath or alcohol content of less than .08?

MR. HARRIS: Judge, I have to object to that question. This witness has already answered the question. She has no idea what the concentration was at the time of the alleged acts.

THE COURT: I heard, counsel. Overruled. Repeat the question one more time. Crash at 1:45, test at 3:20, any scenario that -- finish.

Q. (BY MR. MOORE) Is there any scenario that results in an alcohol concentration of less than .08 at the time of driving?

A. For a person to be less than 08 in that amount of time, we have about 09 difference. So, using our standard drink, an 02, that would be probably four to five standard drinks very quickly before that crash occurred for them to be below .08 with a breath score of .173.

9

. . . .

Q. You testified that there was a possibility of a way for someone to be under .08, a little over an hour and a half, about 95 minutes, 1:45 to 3:20, it is possible for someone to be under .08 at that time, right?

A. Yes, sir.

Q. It's extremely possible – would you agree that it's extremely possible for someone to be under a .15 at the time of that accident?

A. With 90 minutes, yes, it's possible.

Q. It's more possible to be under .15 than under .08?

A. Based on a likely scenario, yes.

Q. Okay. And you don't have to assume any kind of – as the state likes to say, everybody likes to argue or imply unreasonable drinking pattern of four to five drinks in one short, short period of time.

A. Right. I mean, what's normal. It depends on who you are.

Q. Okay. But to be clear, you have no testimony for this jury of what Mr. Meza's BAC or breath alcohol concentration was at the time of commission of the offense?

A. Correct. I couldn't extrapolate it.

## B.    Appellant's Motion for Directed Verdict

At the close of the State's case, appellant's counsel moved for a directed verdict going to "the State's lack of evidence of my client having a breath alcohol concentration of .15 or above, at or near the commission of the offense." He pointed out that he asked that question directly of the State's expert and she responded that "she cannot offer any testimony that his BAC was at or above a .15 at the time of the commission of the offense."

The court denied the motion for directed verdict, stating "I am reasonably certain, counsel, that the State's not going to get a submission on an 'A' DWI [requiring proof of .15 BAC]. It may be sufficient on a 'B' DWI [requiring proof of .08 BAC or loss of the normal use of mental or physical faculties by reason of the introduction of alcohol] as a lesser included offense of a 'A' DWI." The court elaborated:

> THE COURT: And, like I said, the state will not get a charge on an "A." I'm thinking the state, even on their worst day, are going to figure out, gee, Judge, give us a "B" charge, and we're still in hot water tomorrow morning. So, I will not, at this time, instruct a verdict on the "A." I will contemplate tonight how to do that, but I will not expect a submission of an "A" on the *Meza* case tomorrow. If you're looking at it, and prepare for it tonight, it's sort of a little late for my staff, I will look at the possibility or probability of a "B" submission, actually, an ordinary DWI without an "A" element pursuant to *Navarro*. So, I'm thinking, counsel, they're not going to make the "A" through the big day. You refer to it tomorrow morning, it seems imminent that "A" is not Mr. Meza's future. . . . . I don't think the state's going to get an "A."

## C. The Jury Charge

The State's information contained the following language:

> Before me, the undersigned Assistant District Attorney of Harris County, Texas this day appeared the undersigned affiant, who under oath says that he has good reason to believe and does believe that in Harris County, Texas, **DANILO DE JESUS MEZA**, hereafter styled the Defendant, heretofore on or about **MARCH 6, 2015**, did then and there unlawfully operate a motor vehicle in a public place while intoxicated.

> It is further alleged that, at the time of the analysis and *at or near the time of the commission of the offense, an analysis of the*

> *Defendant's BREATH showed an alcohol concentration level of at least 0.15*.

(emphasis added).

At the jury charge conference, the court pointed out that the information contained surplusage that was not required by the statute; namely, the requirement that appellant's BAC be .15 near *the time of the offense* rather than just at *the time of the analysis of his breath*. The court suggested that the State abandon that language in the indictment and then remove it from the proposed charge, which would render the State's inability to do a retrograde extrapolation irrelevant.

The State declined to do so, stating it was department policy—in order to be fair to defendants—not to abandon surplusage language after trial has begun, even when it increases the State's burden. Appellant also argued that it would be inappropriate to remove the language at the end of trial, because it would violate appellant's due process rights. Specifically, appellant's counsel argued that due process requires appellant have notice of what he is charged with and that they had prepared for trial for seven months based on the State's iinformation and pleading that appellant's BAC was .15 "at or near the time of the commission of the offense."

The charge submitted allowed the jury to find appellant guilty of either (1) having a BAC of .15 when the breath test was administered and at or near the

time of the commission of the offense, or (2) the lesser included offense of driving while intoxicated:

> Therefore, if you believe from the evidence beyond a reasonable doubt that in Harris County, Texas, DANILO DE JESUS MEZA, hereafter styled the Defendant, heretofore on or about March 6, 2015, did then and there unlawfully operate a motor vehicle in a public place while intoxicated, and you further find that an analysis of the Defendant's breath showed an alcohol concentration of at least .15 at the time the analysis was performed, and at or near the time of the commission of the offense, then you will find the Defendant guilty.
>
> Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, or if you are unable to agree, you will next consider whether the defendant is guilty of the lesser offense of driving while intoxicated.

"Intoxication" for purposes of the lesser-included offense was defined as "not having the normal use of mental or physical faculties by reason of the introduction of alcohol; or having an alcohol concentration of 0.08 or more."

**D.    The Jury's Verdict and Court's Judgment**

The jury found appellant guilty of "driving while intoxicated with a breath analysis of at least .15 at the time of the analysis, and at or near the time of the commission of the offense, as charged in the Information." The trial court entered judgment on the jury's verdict and sentenced appellant to one year's confinement, probated for 18 months.

## ISSUE ON APPEAL

Appellant brings a single issue on appeal:

"The evidence is legally insufficient to sustain the jury's verdict that Appellant was guilty of the Class A misdemeanor offense of driving while intoxicated with a blood alcohol concentration of at least .15"

## STANDARD OF REVIEW

When reviewing whether there is legally sufficient evidence to support a criminal conviction, the standard of review we apply is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in original). This standard tasks the factfinder with resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts. *Id*. On appeal, reviewing courts "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *See Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015) (citing *Hooper v. State*, 214 S.W.3d 9, 12 (Tex. Crim. App. 2007)).

# ANALYSIS

It is an offense in Texas to operate a motor vehicle while intoxicated in a public place:

**§ 49.04. Driving While Intoxicated**

(a) A person commits an offense if the person is intoxicated while operating a motor vehicle in a public place.

(b) Except as provided by Subsections (c) and (d) and Section 49.09, an offense under this section is a Class B misdemeanor, with a minimum term of confinement of 72 hours.

(c) If it is shown on the trial of an offense under this section that at the time of the offense the person operating the motor vehicle had an open container of alcohol in the person's immediate possession, the offense is a Class B misdemeanor, with a minimum term of confinement of six days.

(d) If it is shown on the trial of an offense under this section that an analysis of a specimen of the person's blood, breath, or urine showed an alcohol concentration level of 0.15 or more at the time the analysis was performed, the offense is a Class A misdemeanor.

TEX. PENAL CODE ANN. §49.04 (West 2011).

The evidence necessary to establish a Class A versus a Class B misdemeanor DWI is different under the relevant statutory scheme. To establish a Class B misdemeanor, the State must prove the defendant operated a motor vehicle while "intoxicated," meaning either (1) "not having the normal use of mental or physical faculties by reason of the introduction of alcohol", *or* (2) "having an alcohol concentration of 0.08 or more." *See* TEX. PENAL CODE ANN. §§ 49.01(2), 49.04(a),(b) (West 2011). In contrast, to establish a Class A misdemeanor, the

State must prove intoxication through alcohol concentration, but only at the time of the analysis rather than the time of driving; for Class A, there is also no option for proving the necessary intoxication through loss of "of mental or physical faculties." TEX. PENAL CODE ANN. § 49.04(d) (providing that State must prove "an analysis of a specimen of the person's blood, breath, or urine showed an alcohol concentration level of 0.15 or more at the time the analysis was performed," to elevate offense to Class A misdemeanor).

The jury charge in this case, however, made establishing a Class A misdemeanor even more onerous for the State than required under section 49.04(d) by adding the additional requirement that appellant have a BAC of .15 *at or near the time of the accident* instead of only "at the time the analysis was performed."

Appellant argues that there is no evidence to support the jury's finding of guilt of a Class A misdemeanor under section 49.04(d) because, while there was evidence that he had a BAC of .17 at the time of his breath analysis, there was no evidence of his BAC at the time, or near the time, of the accident. He points to the State's expert's admissions that:

- She could not state with any degree of scientific certainty what appellant's BAC was at the time of the accident, and that any attempt to do so would be "wildly speculative."

- It is possible that appellant's BAC was lower than .176 at the time of his accident.

16

- Because she was unable to determine at what point in the three stages of alcohol intoxication, i.e., absorption, peak, and elimination, she could not perform a reliable retrograde extrapolation.

- It was "extremely possible" that appellant's BAC was under .15 at the time of the accident.

The State acknowledges, in response, that the Court of Criminal Appeals has recognized, as the State's expert did, that reliable retrograde extrapolation generally requires consideration of "(a) the length of time between the offense and the test(s) administered; (b) the number of tests given and the length of time between each test; and (c) whether, and if so, to what extent, any individual characteristics of the defendant were known to the expert in providing his extrapolation. These characteristics and behaviors might include, but are not limited to, the person's weight and gender, the person's typical drinking pattern and tolerance for alcohol, how much the person had to drink on the day or night in question, what the person drank, the duration of the drinking spree, the time of the last drink, and how much and what the person had to eat either before, during, or after the drinking." *See Mata v. State*, 46 S.W.3d 902, 916 (Tex. Crim. App. 2001).

The State nonetheless argues:

Thus, the only question for this Court to resolve is whether appellant is correct that the jury could not conclude beyond a reasonable doubt from the totality of the evidence adduced that appellant's BAC was at least 0.15 while he drove without being presented with retrograde extrapolation testimony as to what appellant's specific BAC was at

17

that time—a premise which would impose a *de facto* rule that no defendant could ever be convicted of Class A misdemeanor DWI without retrograde-extrapolation evidence.

Considering the entirety of the record in this case, and giving appropriate deference to the jury's verdict and ability to make inferences and conclusions based on the evidence presented, this Court should reject appellant's argument and implicitly-suggested de facto rule. Specifically even without knowing appellant's exact BAC while appellant drove, immediately before he crashed his vehicle, the jury could have reasonably determined that appellant's BAC was at least 0.15 based on the accumulation of the following evidence developed at trial:

- At approximately 1:40 AM, appellant unsafely and excessively sped through a sharp curve in the road and lost control of his vehicle when the road dipped, causing his vehicle to strike the curb, roll over, and crash into a telephone pole before skidding to a stop on its roof.

- Once appellant was able to extricate himself from his car, he walked away from it and the crash scene, and made it approximately 45–50 feet away before Arroyo detained him and returned him to the site.

- Appellant was "kind of stumbling"; "had poor balance"; and seemed "a little lost" when Arroyo saw him walking away from the crash.

- When Arroyo made contact with appellant, Arroyo observed that appellant had red, bloodshot eyes; smelled of alcohol; and had slurred speech.

- Appellant admitted to Arroyo that appellant had been drinking alcohol and stated that he had had five or six Dos Equis beers, though he could not recall where or when he had been drinking.

- At HPD Central Intox, appellant exhibited all six signs of intoxication during the Horizontal Gaze Nystagmus SFST that Skelton administered to him, which Skelton explained indicated a 77% chance that appellant's BAC was higher than 0.10 at that time.

- Skelton had to instruct appellant six times as to how to perform the walk-and-turn SFST, and demonstrated the test for appellant three times, and appellant still exhibited four of the eight clues of intoxication for that

18

test—namely, being unable to maintain his starting position during the instructional phase, using his arms for balance, making an improper turn, and taking the wrong number of steps.

- Appellant exhibited two of the four clues of intoxication for the one-leg stand SFST—namely, putting his foot down and swaying—and also exhibited other signs of impairment by bending his leg when Skelton instructed him not to do so and by miscounting aloud while he performed the test.

- Skelton, too, concluded that appellant was intoxicated, given such factors as the distinct odor of alcohol emanating from appellant, the appearance of appellant's eyes, appellant's poor performance on the SFSTs, [and] appellant's difficulty understanding Skelton's instructions for the SFSTs.

- Intoxilyzer analysis of appellant's breath specimens, provided at 3:19 and 3:22 AM, about 90–95 minutes after appellant crashed his car, showed that appellant's BAC was 0.176 and 0.173, respectively, at those times.

- Appellant was in police custody for the approximately 90–95 minutes between when he crashed his car around 1:40 AM and when his breath-test results of 0.176/0.173 were obtained at about 3:20 AM, and there was no evidence that appellant had any other alcoholic beverages during that timeframe.

- Without accounting for the elimination of alcohol from the body, or the absorption of alcohol by any food that may have been ingested before, during, or after drinking, it would take approximately seven to nine servings of alcohol for a nineteen-year-old male who weighed 150 pounds and stood five feet, nine inches tall, like appellant, to reach a 0.176 BAC.

- The physical and behavioral signs of intoxication that appellant exhibited just before and after the crash—including impaired perception, visual acuity, memory, comprehension, judgment, and motor skills and coordination—were consistent with a high level of intoxication, such as a 0.17 BAC, according to Dr. Kurt Dubowski's chart regarding the stages of acute alcoholic influence or intoxication.

We agree that all of these facts the State points to could be evidence in

support of a Class B misdemeanor intoxication finding that a defendant has lost

19

"the normal use of mental or physical faculties by reason of the introduction of alcohol." TEX. PENAL CODE ANN. §§ 49.01(2), 49.04(a)&(b). But that is not the issue given the jury's finding in this case. Here, the issue is whether these facts can support a finding that, beyond a reasonable doubt, appellant's BAC was higher than .15 "at or near the time of the accident" in the face of the State's own expert witness's testimony that it would be speculation to infer that to be true.

The State cites three cases in support of its argument that the jury could rationally infer from Israel's testimony and the rest of the evidence that, immediately before the wreck, appellant's BAC was at least .15. We conclude that the evidence of a BAC of .15 at or near the time of the accident is insufficient, and that the cases the State relies upon do not establish otherwise.

The State first cites *Anderson v. State*, 416 S.W.3d 884, 888 (Tex. Crim. App. 2013) for the general proposition that a jury is permitted to draw multiple inferences from facts so long as the inferences are supported by evidence presented at trial. This is not a proposition we disagree with, but *Anderson* does not involve a DWI, BAC, or a jury's performing its own retrograde extrapolation despite testimony from the State's expert that it was not possible to do so given the evidence. Instead, *Anderson* held that the jury was permitted to infer that the appellant in that case could have anticipated that his co-conspirator would assault a police officer in furtherance of the conspiracy. 416 S.W.3d at 890.

20

The State also cites *Hooper v. State*, 214 S.W.3d 9, 15–16 (Tex. Crim. App. 2007) for the general proposition that juries are permitted to draw inferences from evidence when inferences are supported by the record and not mere speculation or guessing. Again, this is not a proposition with which we disagree. But, like *Anderson*, *Hooper* does not involve a DWI, BAC, or a jury's performing its own retrograde extrapolation. Instead, *Hooper* (like *Anderson*) involved a conspiracy and the jury's ability to draw inferences to conclude that the defendant was aware of his co-conspirator's violent propensity and whether his co-conspirator's acts could have been reasonably anticipated. *Id.* at 13–14.

The facts of *Anderson* and *Hooper* are inapposite to the issue we are faced with here.

The State next cites *Stewart v. State*, 129 S.W.3d 93 (Tex. Crim. App. 2004) for the proposition that retrograde-extrapolation evidence in not necessary for a jury to logically infer that the defendant's BAC was at or above a particular level. In *Stewart*, the defendant was convicted of DWI, which was defined in the jury charge as "having an alcohol concentration of 0.10 or more" or "not having the normal use of mental or physical faculties by reason of the introduction of alcohol . . . into the body." 129 S.W.3d at 96. The defendant was pulled over for traffic violations, had red and glassy eyes, admitted to the police officer that she had been drinking, failed three of seven field sobriety tests, and took breath tests

21

that registered 0.160 and 0.154 about 80 minutes after she was stopped. *Id.* at 95. At trial, the court admitted the breath test results, but refused to permit the State's expert to give retrograde extrapolation because the expert "conceded that he did not have enough information to determine what Stewart's alcohol concentration would have been at the time she drove." *Id.*

The San Antonio Court of Appeals reversed the defendant's conviction in Stewart, reasoning that "the results of the [breath] tests were irrelevant without retrograde extrapolation and constituted no evidence to show that Stewart was intoxicated when she drove." *Id.* at 95–96 (citing *Stewart v. State*, 103 S.W.3d 483, 486 (Tex. App.—San Antonio 2003)). The court of appeals also concluded that "by admitting the breath test results, the trial court encouraged the jury to conduct its own retrograde extrapolation and to decide the case based on facts not in evidence." *Id.* (citing *Stewart*, 103 S.W.3d at 486).

The Court of Criminal Appeals held that the court of appeals "erred in determining that breath test results are inadmissible without retrograde extrapolation evidence." *Id.* at 95. The court did not, however, hold that the jury could perform its own retrograde extrapolation; rather, the court noted that the results of the tests were relevant because "they provided evidence that she had consumed alcohol." *Id.* at 96:

> Here, the jury had to decide whether Stewart was intoxicated at the
> time she drove. This meant either the jury could find that Stewart was

intoxicated under the *per se* definition—that her blood alcohol concentration was 0.10 or more—or under the impairment theory—that she did not have the normal use of mental or physical faculties by reason of the introduction of alcohol into her body. The breath test results were pieces in the evidentiary puzzle for the jury to consider in determining whether Stewart was intoxicated at the time she drove. The jury had other evidence to decide that issue, such as the arresting officer's testimony about Stewart's driving patterns before he pulled her over, the results of Stewart's field sobriety tests, Stewart's admission to the officer that she had a couple of beers at the concert, Stewart's statement that she "couldn't do [the field sobriety tests] sober," the officer's videotape recording of these events, and the fact that the breath tests were conducted an hour and twenty minutes after Stewart's traffic stop.

The admission of the breath test results did not necessarily encourage the jury to engage in its own crude retrograde extrapolation because the jury did not need to establish Stewart's exact blood alcohol concentration at the time that she drove. The jury only needed to believe beyond a reasonable doubt that either her blood alcohol concentration was 0.10 or more, or that she failed to have the normal use of her mental or physical faculties by reason of introduction of alcohol into her body, at the time she drove. The breath test results were properly admitted evidence to consider with all of the other evidence of intoxication to determine if Stewart was intoxicated at the time she drove. We find that the Court of Appeals erred in finding that the trial court encouraged the jury to decide the case based on facts not in evidence.

*Stewart*, 129 S.W.3d at 97–98.

*Stewart* is distinguishable from the facts presented here, as the issue in *Stewart* was whether breath test results were relevant and admissible to showing intoxication in a case in which the jury was presented with both a *per se* and impairment intoxication theory. *Id.* The Court of Criminal Appeals in *Stewart* noted that, under the definition of intoxication given in that case, the jury was *not*

23

required to determine the defendant's BAC at the time she was driving—it was only required to determine that the defendant was intoxicated. The court characterized the breath tests demonstrating that she had consumed alcohol as "pieces in the evidentiary puzzle for the jury to consider in determining whether Stewart was intoxicated at the time she drove." *Id.*

In contrast, the jury in this case convicted appellant of Class A misdemeanor DWI on jury instructions that required a finding of BAC of .15 *at or near the time of the accident*. In other words, unlike in *Stewart*, the jury here could *only* find appellant guilty through the use of retrograde extrapolation (rather than through a finding that appellant experienced a loss of mental or physical faculties by reason of the introduction of alcohol)—something the State's own expert said could not be done. Accordingly, we disagree with the State that *Stewart* provides authority for the jury to have determined that appellant's BAC was 0.15 or higher at or near the time the accident.

Finally, the State argues that, if we hold there is insufficient evidence to support appellant's conviction for Class A misdemeanor DWI, we are "impos[ing] a *de facto* rule that no defendant could ever be convicted of Class A misdemeanor DWI without retrograde-extrapolation evidence." We disagree. To support a conviction for Class A misdemeanor DWI, the statute only requires the State prove "an analysis of a specimen of the person's blood, breath, or urine showed an

24

alcohol concentration level of 0.15 or more *at the time the analysis was performed."* TEX. PENAL CODE ANN. § 49.04(d) (West 2011) (emphasis added). In other words, the statute never requires retrograde extrapolation for a Class A misdemeanor DWI conviction. It was the jury charge that the State requested in this case that imposed that requirement in this particular case.

Finding no evidence to support appellant's conviction for Class A misdemeanor DWI, we sustain appellant's sole point of error and render a judgment of acquittal.

## REFORMATION OF THE JUDGMENT

The State argues that, "[a]s appellant acknowledges, and the record makes clear, the evidence is sufficient to support appellant's conviction of the lesser-included offense of Class B misdemeanor DWI, at a minimum." Thus, it argues that if we reverse appellant's conviction, we "should reform the trial court's written judgment of conviction and sentence to reflect conviction for the lesser-included offense of Class B misdemeanor DWI, and remand appellant's case to the trial court for a new punishment hearing."

In support, the State cites *Thornton v. State*, 425 S.W.3d 289, 299–300 (Tex. Crim. App. 2014), which holds that, in some circumstances, an appellate court should reform a judgment to reflect a conviction on a lesser-included offense when reversing a greater-inclusive conviction on legal insufficiency grounds:

25

In summary, then, after a court of appeals has found the evidence insufficient to support an appellant's conviction for a greater-inclusive offense, in deciding whether to reform the judgment to reflect a conviction for a lesser-included offense, that court must answer two questions: 1) in the course of convicting the appellant of the greater offense, must the jury have necessarily found every element necessary to convict the appellant for the lesser-included offense; and 2) conducting an evidentiary sufficiency analysis as though the appellant had been convicted of the lesser-included offense at trial, is there sufficient evidence to support a conviction for that offense? If the answer to either of these questions is no, the court of appeals is not authorized to reform the judgment. But if the answers to both are yes, the court is authorized—indeed required—to avoid the "unjust" result of an outright acquittal by reforming the judgment to reflect a conviction for the lesser-included offense.

*Thornton*, 425 S.W.3d at 300 (citations omitted).

Here, applying the test set forth in *Thornton*, we decline to reform the judgment to reflect a conviction for Class B misdemeanor DWI. The only fact that the jury found in convicting appellant of Class A misdemeanor DWI was that appellant's BAC was at least 0.15 at the time of testing *and* at or near the time of the accident. We have reversed that that conviction and ordered an acquittal because it required the jury to perform retrograde extrapolation to determine BAC at or near the time of the accident that the State's expert said was scientifically impossible to perform.

The jury was also charged on a lesser-included offense of Class B misdemeanor DWI, under which it could have found appellant guilty upon finding that appellant operated a motor vehicle intoxicated, defined as "not having the

normal use of mental or physical faculties by reason of the introduction of alcohol; or having an alcohol concentration of 0.08 or more."

Because intoxication under a Class B misdemeanor requires the jury to assess whether the defendant operated a motor vehicle while intoxicated, retrograde extrapolation back to the time of driving is required to convict on BAC of at least 0.08 (per se theory). The State's expert stated that was not possible to do on this record. As an alternative, the jury can convict for a Class B misdemeanor DWI upon a finding that, at the time of operating a motor vehicle, the defendant did not have "the normal use of mental or physical faculties by reason of the introduction of alcohol" (impairment theory). Such an analysis does *not* require the retrograde extrapolation because the jury can convict without finding a particular BAC under the impairment theory. *Stewart*, 129 S.W.3d at 29.

Here, to reform the judgment, we would have to determine that "the jury . . . necessarily found every element necessary to convict the appellant for the lesser-included offense." *Thornton*, 425 S.W.3d at 300. The jury's only finding was that appellant had a BAC of at least 0.15 at or near the time of the accident, which necessarily encompasses a BAC of 0.08, but we have held that *any* BAC finding requiring the jury to perform retrograde extrapolation is not legally sufficient evidence. And, while there was ample evidence to support the impairment theory (rather than the per se theory) of Class B misdemeanor DWI, the jury did not make

any findings regarding the impairment theory because that is not part of the Class A misdemeanor DWI instruction.

Accordingly, we reject the State's request that we reform the judgment to reflect a conviction for Class B misdemeanor DWI, and we instead remand to the trial court for a new trial on that offense.

## CONCLUSION

We sustain appellant's sole issue, reverse his conviction for Class A misdemeanor DWI and render a judgment of acquittal on that charge. We remand for a new trial on the lesser-included offense of Class B misdemeanor DWI.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Lloyd.

Publish. TEX. R. APP. P. 47.2(b).

28