

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-17-00106-CR

JOHN ANTHONY MILLER                                                        APPELLANT

V.

THE STATE OF TEXAS                                                              STATE

----------

FROM COUNTY CRIMINAL COURT NO. 3 OF TARRANT COUNTY
TRIAL COURT NO. 1428624

----------

## MEMORANDUM OPINION[1]

----------

A jury convicted appellant John Anthony Miller of driving while intoxicated, misdemeanor repetition. *See* Tex. Penal Code Ann. § 49.09(a) (West Supp. 2017). The trial court sentenced him to 365 days in the county jail, probated for 15 months. *See id.* § 12.21(2) (West 2011). Miller contends, in his first point, that the evidence was insufficient to support his conviction and, in his second point,

---

[1]*See* Tex. R. App. P. 47.4.

that the State's expert witness's testimony was insufficient to support his conviction. We construe these as two sufficiency complaints, with the latter focusing on one particular aspect of the State's case. We affirm.

**Standard of Review**

In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the offense's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We

must presume that the factfinder resolved any conflicting inferences in the verdict's favor and must defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

## The Dispute

"Intoxicated" means "not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body . . . ." Tex. Penal Code Ann. § 49.01(2)(A) (West 2011). The State alleged and the jury found that Miller drove a vehicle while intoxicated. The State presented evidence that (1) Miller had a large amount of marijuana in his system and (2) marijuana could intoxicate a person—that is, cause a person to not have use of his normal mental or physical faculties. In contrast, Miller maintained that the evidence showed that (1) his conduct was attributable to a manic episode and a physical impairment and (2) the State's expert witness, a toxicologist, affirmatively denied knowing whether the marijuana in Miller's system intoxicated him.

## The Evidence

### *Officer Gasca*

Officer Eduardo Gasca was a patrol officer for the Fort Worth Police Department. On June 14, 2015, he was working the night shift, from 8:00 p.m. to 6:00 a.m. Around 5:00 a.m. he saw a pickup truck speed past him; he followed it and determined that it was still speeding even as it was approaching a red light.

There were three lanes—a left-turn lane, a straight lane, and a right-turn lane—and the pickup was in the left-turn lane. Thinking that the pickup's speed meant it was going to run the red light, Officer Gasca became concerned. He then saw the brake lights illuminate and, without stopping, the pickup turned to the right from the left-turn lane.

Following the pickup to the right, Officer Gasca saw it swerve just as he was turning on his patrol car's overhead lights. Officer Gasca testified that normally when he activated his lights, drivers would slow down and pull over or put on their car's hazard lights until they reached a safe parking lot. Instead, the pickup stopped immediately in an almost perpendicular fashion.[2] Officer Gasca's dashboard camera showed that the pickup swerved in an arc from the right lane nearest the curb into the adjacent left lane and stopped obliquely—so that it was pointing back toward the far right lane—just beyond the crosswalk in the intersection itself.

When Officer Gasca walked up to the car, the driver, whom he identified at trial as Miller, rolled down his window, thereby releasing a "pretty strong" marijuana odor. Miller had bloodshot, watery eyes and slurred speech and looked intoxicated to Officer Gasca, so Officer Gasca asked him if he had been drinking; Miller denied consuming any alcohol. The odor, however, prompted

---

[2]The second officer to arrive at the scene described the pickup as being in the middle of the roadway instead of on the right-hand edge where a normal traffic stop would take place.

Officer Gasca next to ask Miller if he had smoked any marijuana, and Miller responded that he had, about an hour earlier.

At that point, Officer Gasca asked Miller to step out of the vehicle. Because of all the circumstances, Officer Gasca testified that he thought that Miller was most likely driving while intoxicated, so Officer Gasca wanted to confirm his suspicion with a standardized field sobriety test. For Officer Gasca's own safety, he waited for another officer to assist him. Officer Michael Sullivan responded, and it was he who conducted the actual field sobriety test while Officer Gasca observed.

Based on his watching Miller perform the walk-and-turn and one-leg-stand tests, Officer Gasca thought that Miller was intoxicated or, put another way, that Miller had "lost his normal use of his faculties." The two officers placed Miller under arrest and transported him to the jail, where Miller consented to a blood test. Officers Sullivan and Gasca then took Miller to John Peter Smith Hospital for that purpose.

*Miller's Bloodwork*

Charlotte Towler worked at John Peter Smith Hospital in Fort Worth as a registered nurse. On June 14, 2015, she drew Miller's blood at 6:33 a.m.

Connie Lewis worked in the toxicology department of the Tarrant County Medical Examiner's Office. She tested Miller's blood for THC, the psychoactive ingredient in marijuana, and the results showed 33 nanograms per milliliter, an

5

amount she described as uncommon; two to ten nanograms were what she usually found.

*Dash-cam Video*

The jury watched the video from Officer Gasca's dash camera, which was triggered to start recording when he turned on his overhead lights. The video included Miller's field sobriety test.

*Officer Sullivan*

Officer Sullivan testified that when he arrived, he could smell a "[v]ery strong" marijuana odor from about ten to fifteen feet away. In speaking with Miller, Officer Sullivan found his responses to be "slow, sluggish." Once out of the pickup, Miller continually leaned on it for support, so Officer Sullivan instructed him to move away, after which Officer Sullivan noticed that Miller swayed, his balance was unsteady, and he had trouble walking.

Wanting to rule out other possible reasons for Miller's behavior, Officer Sullivan testified that he asked Miller if he was currently taking any medications or if he was currently suffering from any disabilities or medical problems, and Miller responded that he had broken his leg several years earlier. But when Officer Sullivan asked Miller if he was capable of walking a straight line or standing on one leg, Miller did not deny being capable and did not alert Officer Sullivan to any other medical conditions.

6

Officer Sullivan asked Miller to perform the standardized field sobriety tests, including the horizontal gaze nystagmus test ("HGN").[3] "Horizontal gaze nystagmus," Officer Sullivan explained, "is caused by alcohol as well as other central nervous system depressants and PCP." But Officer Sullivan acknowledged that THC did not cause HGN.[4] Officer Sullivan saw zero of the six possible "clues" for HGN, consistent with someone who had only smoked marijuana and had not drunk alcohol.

During the walk-and-turn test, Miller failed to maintain his balance, used his arms to try to maintain his balance, stepped off the line by about a foot, made an improper turn, and failed to touch his heel to his toe during the steps. Officer Sullivan testified that these were all "clues" suggesting intoxication. The "decision point" in the walk-and-turn test that indicates possible intoxication is when the individual exhibits two out of the eight clues. Miller exhibited five of them.

During the one-leg-stand test, which has four "clues," Miller exhibited all of them: he swayed while balancing, he put his foot down, he used his arms for balance, and he hopped. According to the National Highway Traffic Safety Administration guidelines, "the decision point" for the one-leg stand was also two clues.

---

[3]HGN is the involuntary jerking or twitching motion that eyes make when looking sideways; this phenomenon is more pronounced in someone impaired by alcohol and certain drugs.

[4]The toxicologist who testified also stated that THC did not cause HGN.

Officer Sullivan testified that "based on the totality of everything that [he] saw, heard, smelled, and observed," he believed Miller was intoxicated based on "[t]he loss of mental or physical faculties due to the introduction of a substance." Officer Sullivan testified that he had received training about people who were manic depressive, but he did not remember hearing anything about its affecting their balance or causing them to exhibit signs normally associated with intoxication. Officer Sullivan denied seeing any signs of mental illness in Miller that night.

*Dr. Johnson*

Dr. Robert Johnson was the chief toxicologist at the Tarrant County Medical Examiner's Office. He holds a bachelor's degree in biochemistry and a master's and a Ph.D. in chemistry. He has written 60 publications on toxicology, but only one was specifically on marijuana, and it did not deal specifically with driving an automobile but instead with pilots who had crashed while having THC in their bloodstreams. In addition to being board certified by the American Board of Forensic Toxicology, Dr. Johnson belongs to the Society of Forensic Toxicologists, the American Academy of Forensic Sciences, and the Southwestern Association of Toxicologists. And Dr. Johnson testified that in addition to having read dozens of articles, he has taken courses on how drugs affect the human body and on how those effects relate to everyday activities like driving. Dr. Johnson has testified as a toxicology expert over 100 times.

Dr. Johnson testified that marijuana's or THC's common side effects are drowsiness, dizziness, and confusion, along with red, watery eyes and hunger. As a consequence, not being able to maintain one's balance as instructed by a police officer could be consistent with being intoxicated by THC.[5]

Dr. Johnson explained that each person's body could adapt to a drug's physical effects and quickly develop a tolerance—the degree of which can differ from person to person—for the particular drug. The longer someone uses any drug, the more the person's body adapts, so that the drug's physical effects become less apparent. He agreed generally that someone who had used marijuana for a long time would have to take a very large amount before being impaired.

In situations such as driving, in which a person's attention was divided, Dr. Johnson testified that THC could impair that person's coping ability. If someone was experiencing THC's side effects, it would slow down the person's reaction time and make "stoned driving just as risky as drunk driving."

Dr. Johnson testified that 33 nanograms of THC per milliliter was a high amount and that his laboratory typically saw between three and five nanograms per milliliter in DWI cases. He stated that Texas had no law specifying how many

---

[5]Dr. Johnson did agree that having one leg shorter than the other might impact a person's ability to perform the walk-and-turn test (but not the one-leg stand).

nanograms presumptively constituted intoxication and that whether a person was intoxicated had to be determined by observing.

Acknowledging that he could not tell the jury that Miller's THC level intoxicated Miller, and conceding that the lab report did not prove intoxication, Dr. Johnson agreed that he could tell the jury only about marijuana's general effects on average people and how marijuana affected driving generally.

To determine whether Miller was intoxicated, Dr. Johnson told the jury that it needed to rely on three informational pieces, of which the lab report was just one. The other two were Miller's conduct both before and after the police pulled him over. As Dr. Johnson readily conceded, "The laboratory report on [its] own doesn't prove anybody is intoxicated."

*Donna Howard*

Donna Howard was Miller's sister and testified on his behalf. She testified that Miller was diagnosed with bipolar disorder and that when he was manic, he talked very fast and became "kind of detached from reality" and did not "make sense." She said that in such a state Miller became very reckless, drove fast, and would drive "in and out of cars." She did not know if it affected his balance, but she added, "He just is kind of all over the place," and "[h]e . . . moves constantly and that sort of thing," stumbling over his words and losing his train of thought. Miller's behavior would become "very irrational."

Howard said that Miller had been smoking marijuana since he was 14.[6] She described her brother as "kind of goofy" when smoking marijuana. "Mostly just his eyes would be kind of glassy," she added, and "[h]e may be a little more relaxed."

She also said that Miller had broken a leg when he was in high school and that the doctors set the leg improperly so that one leg was perhaps a half-inch shorter than the other—something that affected Miller's balance if he was not wearing corrective inserts in his shoes. (In the video, Miller was barefoot.) She said, "I've seen him stumble, you know, probably lots of times. But he just doesn't have good balance."

### Ken Ankenbauer

The next witness was Ken Ankenbauer, a good friend of Miller's. Ankenbauer testified that when manic, Miller would talk fast, spend a lot of money, dream up all kinds of business adventures, not sleep at night, and say things that "normal" people would find "just crazy talk." Ankenbauer further explained that when Miller was manic, his eyes would glass over and his driving would be more radical and careless. It was possible, Ankenbauer agreed, to be manic, intoxicated, and driving at the same time. Ankenbauer testified that he could not tell the difference between when Miller was in a manic state and when Miller was intoxicated.

---

[6]The indictment shows that Miller was born in September 1958 and was 56 years old in June 2015.

*Richard Howard*

Miller's last witness was Richard Howard, his brother-in-law. In the last couple of years, Howard had noticed a change in Miller: he had begun having grandiose ideas that "probably weren't really rooted in reality." Miller had no balance problems, to Howard's knowledge.

**Discussion**

In his first point, Miller contends that "[t]he evidence was legally insufficient to support a conviction for the offense alleged in the information for driving while intoxicated because there is no evidence that appellant Miller was intoxicated." Based on his briefing, his first point is clearly a sufficiency challenge.

In his second point, Miller contends that "[t]he State's expert witness admitted that he was not competent to testify as to the effects of marijuana in this case to render appellant Miller intoxicated." Miller does not argue that the trial court improperly admitted Dr. Johnson's testimony; rather, Miller seems to argue that because Dr. Johnson himself conceded that he could not say that Miller was intoxicated, there was a fatal evidentiary gap in the State's case. We construe this as a sufficiency attack on the offense's intoxication element.

Because both his first and second points attack evidentiary sufficiency, we address them together.

Miller relies primarily on *Smithhart v. State*, 503 S.W.2d 283 (Tex. Crim. App. 1973). There, the State alleged that the defendant was intoxicated by drugs while driving, and the evidence showed that the defendant had drunk vodka and

taken seven valiums that day. *Id.* at 285. In the absence of expert testimony that the valium would have rendered the defendant intoxicated—either by itself or when mixed with vodka—the court held that the State had not proved that the defendant had been intoxicated by drugs while driving. *Id.* at 286.

But Miller's reliance on *Smithhart* is misplaced. The *Smithhart* court noted that intoxication by alcohol was such a common occurrence that recognizing it required no expertise, but when the accused was allegedly intoxicated by some other drug, the same was not true. *See id.* Dr. Johnson's testimony avoided the *Smithhart* problem by confirming that marijuana could in fact render a person intoxicated.

Miller also relies on *Mata v. State*, 46 S.W.3d 902 (Tex. Crim. App. 2001). At trial, Miller tried to exclude Dr. Johnson's testimony based on *Mata*, a case in which an expert testified on retrograde extrapolation to determine that the defendant's blood-alcohol content (BAC) at the time of his arrest exceeded the legal limit. *Id.* at 905. But when reviewing the literature on retrograde extrapolation, the court of criminal appeals determined that the expert did not have the information he needed to arrive at something resembling a reliable conclusion. *Id.* at 917. The majority thus held that the trial court abused its

discretion by admitting portions of the expert's testimony and remanded the case for a harm analysis.[7] *Id.*

*Mata* does not help Miller. As noted, the expert in that case testified that, based on his retrograde extrapolations, the defendant's BAC exceeded the legal limits, effectively telling the jury that the defendant was guilty. Dr. Johnson did no such thing here. Rather, Dr. Johnson did just the opposite: he candidly informed the jury that his testimony, standing alone, would not be enough to convict Miller.

Miller complains that by noting that he had 33 THC nanograms per milliliter in his blood, whereas the average amount in the lab's marijuana DWI cases was only three to five THC nanograms per milliliter, Dr. Johnson encouraged the jury to convict Miller because his amount exceeded the average. We disagree. Dr. Johnson explicitly declined to say that Miller was intoxicated, because Dr. Johnson did not know his tolerance level. If Dr. Johnson had concluded Miller was intoxicated without knowing Miller's tolerance level, he arguably would have committed the same error as the *Mata* expert. In contrast, though, Dr. Johnson made clear that he was not there to testify that Miller *was* intoxicated by marijuana but only to testify that marijuana *could* render a person intoxicated— precisely the information that was missing in *Smithhart*, and information the jury needed here to link Miller's conduct to the marijuana in his system.

---

[7]After a second remand, the San Antonio Court of Appeals concluded that the error was harmful. *Mata v. State*, 143 S.W.3d 331 (Tex. App.—San Antonio 2004, no pet.).

14

The two scenarios presented to the jury were that Miller's conduct was attributable either to marijuana intoxication or to a manic episode coupled with a physical impairment. The evidence showed that Miller had elevated marijuana amounts in his system and that marijuana could cause intoxication. From Miller's erratic driving before he was pulled over and from his poor performance during the field sobriety tests after he was pulled over, the jury could have concluded that Miller's body, despite its having been exposed to marijuana for perhaps decades, would still feel the intoxicating effects of 33 THC nanograms per milliliter. Moreover, Officer Sullivan described Miller as "sluggish," behavior that was consistent with marijuana intoxication but inconsistent with the frenzied or frantic behavior that Miller's witnesses observed during his manic episodes. Finally, although Miller apparently had one leg that was shorter than the other, the jury—whose job it was to judge the evidence's weight—was free to attribute Miller's conduct to marijuana intoxication and not to any physical impairment. Viewing the evidence in the light most favorable to the verdict, we hold that a rational factfinder could have found that Miller was driving while intoxicated by marijuana. *See Jenkins*, 493 S.W.3d at 599.

We overrule Miller's evidentiary sufficiency challenges.

**Conclusion**

We affirm the trial court's judgment.

                                                            /s/ Elizabeth Kerr
                                                            ELIZABETH KERR
                                                            JUSTICE

PANEL: WALKER, MEIER, and KERR, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 12, 2018